## Commonwealth v. Bell

*Janet Moschetta,* for plaintiff.
*Lee Moses,* for defendant.

SWEET, *P.J.,* June 18, 1982—The higher courts have held that we cannot juggle the money from one relief client to the other in pursuance of support.[1] If the issue between husband and wife is

---

1. Com. ex rel. Valentine v. Valentine, ___ ___, 405 A. 2d 933, (1979).

"who gets the relief check for the child?", that is a custody matter, not a support one.[2]

In this case Thomas B. Bell has been charged with the paternity of Tracie Locy's baby, Matthew Charles Locy, born July 13, 1981. The hearing was held on January 7, 1982.[3]

At the February 16, 1982 hearing, defendant sought a free blood test.

We do not have a specific rule in this county for the time when blood tests must be requested. However, it should be apparent to anyone who wants to keep the wheels of justice turning that the first day set for the hearing in open court on the merits would surely be the last opportunity. Accordingly, we can and do reject this belated plea as untimely. Since, however, the practice has not been uniform in this respect and defendant seeks to bring a test case here, we may as well go all the way on the thing.

There are in use, in Southwestern Pennsylvania, two blood tests; the ABO test or Blood Group, is authorized by a specific statute.[4] For more than a dozen years this test has been routinely sought and routinely granted on the payment of $50 which

2. It is almost a classic of the libertarian position to have two adjoining county legal services fighting over the ultimate incidence of a relief check for an illegitimate baby. In a rational society, the welfare supervisor of the domiciliary county would make the assignment and the child would automatically follow.

3. At this hearing, Bell's attorney, Francis Sichko, Esq., went on vacation and did not provide cover for his client. Partial testimony was taken from the prosecutrix and witnesses on her behalf and the case was continued for defendant to consult with his counsel after reviewing the transcript. Defendant then appeared on February 16, 1982, with Lee Moses, Esq., of the Southwestern Legal Aid Society and the request for an HLA test was made.

4. 42 Pa.C.S.A. §6131, et seq.

covers the costs of this simple, accurate and now almost uniformly accepted test. It might be noted that defendant did not request the ABO test at any time.

There is also in the world, and out here now, the HLA test, described rather more fully in our recent opinion in the case of Com. v. Bruce Macbeth, at 22 D. & C. 3d 179 (1981). In this case we decided that it is now the law of Washington County that such tests may be used, not only negatively as the ABO can be used, but also affirmatively, to determine a matter of paternity.

As far as I am aware, no one has sought a free ABO test here. The relatively modest charge is apparently within the reach of the putative fathers of bastards. In this one, although his circumstances as described in the oral testimony do not lead to conclusive exoneration, he wants to go the full route before taking the first step. He has even stipulated that if the test is unfavorable to him, he will agree that it can be admitted into evidence.

This furnishes a second reason for denying his petition. In addition to its untimeliness, it represents overkill. If he cannot be the father of her child, the ABO test will likely exclude him and the result he seeks can be obtained at a rather modest expense.

The main drawback of the HLA test is its expense, which until recently was $600. I am advised that our Domestic Relations Office has arranged an HLA day and that a number of these tests are going to be given at once with the equipment and material being brought out here for a single, mass performance. This brings the cost down to $300 under those circumstances.

As far as I know, no decision of the higher courts in Pennsylvania compels us to grant this petition

for a free HLA test. It is argued however, that a Connecticut case, heard and appealed on a rather different body of statutory and case law than we have developed, has resulted in an adverse decision from the Supreme Court of the United States, set forth in Little v. Streater, 101 Supreme Court 2202, (1981), 68 L.Ed. 2d. 627, (1981) Little v. Streater held that the Connecticut statute, which provided that in paternity actions, the cost of blood grouping tests is to be borne by the party requesting them, denied due process when applied to deny such tests to an indigent defendant. Our defendant is probably indigent for $600. I might observe at the beginning, in distinguishing the Connecticut law from Pennsylvania's on this point, that Chief Justice Burger in writing the Little opinion, said that due process standards,

" . . . govern appellant's due process claim, which is promised on the unique quality of blood grouping tests as a source of exculpatory evidence, the State's prominent role in the litigation, *and the character of paternity actions under Connecticut law.*"(Emphasis supplied.)

Justice Burger rightly points out the ability of blood grouping tests to exonerate innocent putative fathers. The gist of the distinction between Connecticut law and ours is made apparent by the following quotation from the Little opinion:

"Moreover, the defendant in a Connecticut paternity action faces an unusual evidentiary obstacle. Connecticut's original 'bastardy' statute was enacted in 1672 . . . if such mother or expectant mother continues constant in her accusation, it shall be evidence that the respondent is the father of such child . . . 'the mother still has the right to

rely upon prima facie case made out by constancy in her accusation . . . The prima facie case so made out places upon the reputed father the burden of showing his innocence of the charge, and under our practice he must do this by other evidence than his own.' . . . Under Connecticut law, therefore the defendant in a paternity suit is placed at a distinct disadvantage in that his testimony alone is insufficient to overcome the plaintiff's prima facie case."

In Pennsylvania this is not so. The burden of proof is upon the prosecutrix in a civil proceeding to establish by a mere preponderance of the testimony that the child is the defendant's. His denial may be deemed by the trier of fact, the more oathworthy of the two. There are few judges in Pennsylvania who have not, at some time, found in a bastardy case, in favor of defendant.

The Supreme Court opinion, itself, cites Pa. Cons. Stat. Ann. Section 42-6135 (Purdon Supp. 1981), to provide that the expense could be "advanced by the state and then taxed as costs to the parties." Obviously, therefore, our procedural, evidentiary, substantive, and cost provisions are different from those of Connecticut. While the Little case can be, and perhaps will be, held at some time in the future, to authorize the payment of costs in bastardy by a kindly Commonwealth, on behalf of any indigent defendant, no matter how frivolous his request, it must be recognized that the Little case does not automatically apply to us.[5]

_____

5. In Phillips v. Pennsylvania Higher Educational Assistance Agency, 657 F. 2d 554 (1981), the Third Circuit discusses Little v. Streater, supra. They said in part, (p.566), that the non-waivable fee for paternity tests caused deprivation of access to the court. "The tests were crucial because, under Connecticut procedure, without such corroborating evidence a de-

In Mangus v. Britton, 16 D. & C. 3d (1980), Judge Caldwell of Dauphin County awarded "blood tests" in a case procedurally very like our own. However, he conditioned this upon the defendant to furnish: "affidavits . . . that plaintiff was having sexual relations with other men besides defendant." I view the Mangus case as authority that the judge may award a belated blood test to defendant whose request is not frivolous, if he chooses so. I note that Judge Caldwell says, "These actions on our part, however, did not invalidate or suspend in any way our determination of paternity . . . The determination is still in effect and it was incumbent upon defendant to obtain the affidavits and/or the test if he wished the court to reconsider its determination of paternity."

Now, let's look at the public policy implications. According to Poverty in Pennsylvania, 3d. Ed., Jan., 1979, upwards of 15 percent of the births in Pennsylvania are illegitimate. We have 168,000 births a year. 15 percent of that is 25,872. It is not unfair to assume that in half of the cases involving children born out of normal wedlock, there is a dispute concerning paternity. If that proved so and the cost of an HLA test is the $600 figure noted hereinbefore, we would have a statewide cost of $15,600,000, annually. Even assuming that the costs can be brought down to $300 per case, that would be a cost of over $7,000. For us here in Washington County alone, it would be more than

---

fendant's denials were, as a matter of law, insufficient defense in a paternity action."

The Third Circuit, speaking through Judge Rosenn goes on to say: "Without paying those costs, the state defendant was foreclosed from presenting a successful defense." It is fairly apparent thus that the Third Circuit sees Little as applying to the Connecticut procedure as described.

$60,000, annually. I am reluctant to impose this charge on the Commissioners without the benefit of a Pennsylvania statute[6] or appellate case. The indigent defendant has almost nothing to lose by making the request and the Commonwealth almost nothing to gain by granting it.

If the defendant is truly indigent, it is unlikely he will respond to a support order, so the child will not likely be separated from the relief rolls, by reason of determining the fatherhood. Even those that know that they were with the woman during the critical period and who have no evidence of any other paramour, can conjure up some nonresident "Roger the Lodger" upon whom to base a claim.

In the nature of things most of the money would be wasted. There seems to be statistical reasoning from first principle which makes it clear that we would locally pay out thousands of dollars in tests and get little back in exoneration of welfare disbursements or otherwise.

For all of these reasons:

(1) The untimeliness of the request,

(2) the failure to try the simpler test first,

(3) the expense of the test,

(4) and the dissimilarity of the Connecticut procedures to our rules governing bastardy cases, I feel obliged to refuse respondent Bell's request for a free

---

6. We have the Uniform Act on Blood Tests to Determine Paternity which is apparently in force in nine states, apearing at 42 Pa.C.S.A. et seq. However, this Act, a reinactment of the Act of July 13, 1961, at one time 28 P.S. Section 307 et seq., refers to the ABO test. For instance, it can compel a verdict of acquittal, but cannot conclusively convict. The section on the effect of test results says what will be done if, " . . . evidence based upon the tests are that the alleged father is not the father of the child . . . " It will be recalled that the ABO test can exclude, but not include the defendant.

blood test. Of course, nothing stated herein precludes him from obtaining or advancing money and having the test at his own expense. Exceptions noted.